Judgment rendered March 9, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,480-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MAGGYE REBECCA TURNER WINTERER                    Plaintiff-Appellee

versus

SETH RUSSELL WINTERER                    Defendant-Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 603,282

Honorable Brady O'Callaghan, Judge

* * * * *

CARMOUCHE, BOKENFOHR, BUCKLE
& DAY, PLLC
By: John N. Bokenfohr                    Counsel for Appellant

SOCKRIDER, BOLIN, ANGLIN &
BATTE
By: Gregory H. Batte                    Counsel for Appellee

WEEMS, SCHIMPF, HAINES,
SHEMWELL & MOORE
By: Kenneth P. Haines                    Counsel for Appellee

* * * * *

Before MOORE, STONE, and ROBINSON, JJ.

**ROBINSON, J.**

In this relocation dispute, a father who opposes relocation appeals the judgment permitting the relocation to occur. After converting this appeal to a writ, we deny the writ and refer this matter to the trial court for consideration of any remaining custody matters.

**FACTS**

Maggye Winterer and Seth Winterer were married on February 22, 2013, in Caddo Parish. A son, H.W., was born on May 31, 2013. A second son, W.H., was born on November 6, 2016. Maggye has a son from a prior marriage who is two years older than H.W. Maggye has domiciliary custody of her oldest son.

Seth was born in Spokane, Washington, and moved to Shreveport to attend college at Centenary. Following graduation, he worked ten years for a company which sold online advertising before leaving that company in the beginning of 2014. He stayed at home for approximately a year to help raise H.W., then worked with a digital marketing company for a few months. In 2016, he started a business with two associates but they eventually went their separate ways. In 2017, he started Digital Logic, which builds websites and does internet marketing for businesses, mostly law firms, around the country. Seth earns between $100,000 and $200,000 per year.

The couple lived in Shreveport during their marriage. They began experiencing marital woes in 2016 when Seth thought Maggye's spending was excessive. In May of 2017, Seth discovered that Maggye had taken $54,000 from the account of Conversion Twelve, a business that he owned. Maggye was a member of Conversion Twelve, but she lacked signature authority on the account. Seth sold her engagement ring to recover some of

the money. He also believed that Maggye was taking his Adderall medication. Maggye complained that she would ask for help at home but Seth would tell her to handle it herself.

In July of 2017, Maggye checked herself into Willis-Knighton Rehabilitation Center for substance abuse treatment. On July 20, 2017, Maggye entered into treatment at Edgefield Recovery Center near Alexandria, Louisiana. The couple agreed that Maggye's mother would watch the boys in Alexandria during the week while she was in treatment so Seth could work. Maggye remained at Edgefield for less than three weeks.

It was noted in a psychiatric evaluation on July 26, 2017, that Maggye had been abusing opiates and Adderall. She reported using ten narcotics and drinking a fifth of whiskey per day. Maggye told the psychiatrist that she planned to live with her mother and three children in Alexandria on the farm and get a job. The diagnostic impression was severe alcohol use disorder and severe opiate use disorder.

On August 30, 2017, Maggye wrote in a letter to Seth that her intent was to permanently relocate with the children to Alexandria. The reasons that she gave for relocating were: (i) her family in Alexandria was a very good support system for her and a huge help with the kids; (ii) living in Alexandria would significantly improve the boys' lives as they have a safe neighborhood setting there; (iii) public schools in Alexandria are generally better than the ones in Shreveport and their school is one of the more popular ones and is only three blocks away; (iv) there is a program for confidence building and self-esteem in Alexandria; and (v) moving in the middle of the school year would not benefit the boys.

On September 5, 2017, Maggye filed a petition for a La. C.C. art. 102 divorce in Caddo Parish. Maggye sought joint custody of the children with her being named domiciliary parent, as well as child support and spousal support. There was no mention of relocation in the petition.

On September 22, 2017, Seth filed an objection to relocation of the children. He sought a temporary and permanent order preventing the relocation. He requested that the court appoint a custody evaluator expert to determine whether the proposed relocation was in the best interest of the children. The service note said it was sent to Maggye's attorney by fax and U.S. Postal Service.

On that same date, Seth filed an answer and a reconventional demand. He prayed for joint custody with him being named as domiciliary parent, along with child support. He asserted that Maggye was precluded from receiving spousal support. A hearing was set for October 5, 2017. Maggye filed her answer to the reconventional demand on October 2, 2017. It did not mention relocation.

On October 20, 2017, the trial court entered an interim order agreed to by the parties which awarded joint custody with Maggye as the domiciliary parent. Seth, who would have custody every weekend, was ordered to pay child support and interim spousal support. The custody exchange would take place near Natchitoches. Trial on the incidental matters was reset for December 12, 2017.

A new interim order agreed to by the parties was entered on January 23, 2018. Seth's child support obligation increased, but the amount he paid in interim spousal support decreased. The custody arrangement remained in effect.

Maggye texted to Seth on October 12, 2017, "We are moving back to Shreveport no matter what ...." Later that month, she texted to him, "I'm moving back to Shreveport so you can be with your boys." When Seth responded that having the kids live by him was the most important thing to him, she replied, "Understand. Which is why we are moving back and why I told you a few ideas to get out of the lease[.]" After Thanksgiving of 2017, Maggye texted to Seth, "I'm moving back for you Seth." Presumably in January of 2018, Seth texted, "I hate to not see those kids everyday[.]" Maggye texted in reply, "Well Seth only a few more months Then we can be neighbors and both will be able to see them every day[.]" On March 1, 2018, Maggye texted to him, "We need to figure out what school we want the boys in next year and if I need to start looking for a house to buy or if we may be moving back in together or what[.]"

An order granting Maggye's motion to substitute counsel was signed by the trial court on July 30, 2018. On August 2, 2018, Seth filed a petition for a La. C.C. art. 103 divorce and a motion to set trial on custody and relocation. The relocation and custody issues were set to be tried on October 25, 2018. On August 7, 2018, the trial court signed an order allowing Seth to substitute his counsel of record.

On October 10, 2018, Maggye and Seth filed a joint motion for the court to appoint Dr. John Simoneaux to evaluate the family. The court ordered that all pending matters be reset when Dr. Simoneaux's report was rendered. All previous orders were to remain in force and effect.

On October 12, 2018, Seth filed a rule for judgment of divorce. A judgment granting the divorce was rendered on November 28, 2018.

***Dr. Simoneaux's report***

Dr. John Simoneaux was appointed by the court to examine Maggye and Seth. He interviewed Seth on March 5, 2019, and Maggye a couple of days later. Dr. Simoneaux's report was issued on March 29, 2019.

Dr. Simoneaux noted that Seth had an arrogant attitude regarding Maggye. The clear implication that Seth gave to Dr. Simoneaux throughout the interview was that Maggye is not as smart, worldly, or as sophisticated as he is, and by implication, not as good a parent as he would be.

Seth told Dr. Simoneaux that after he realized the money was missing and later noticed Maggye was drinking more, he began staying at the office to avoid fighting in front of the kids. Dr. Simoneaux noted that although Seth was staying away because of his concerns about her drinking, he was still leaving the children in her care.

Dr. Simoneaux wrote that he was puzzled that Seth allowed Maggye's parents to care for the children while she was in treatment since he had some availability. Dr. Simoneaux also noted that following inpatient treatment, Seth agreed to Maggye and the kids remaining in Alexandria through December. Dr. Simoneaux further noted that the situation must not have seemed grave to Seth because he took no action to remove the children from the care of Maggye or her parents.

Seth told Dr. Simoneaux that the perfect solution would be for Maggye to move back to Shreveport and share equal custody. Dr. Simoneaux was puzzled that Seth would be willing to enter into an equitable physical custody arrangement after he was so critical of her. Dr. Simoneaux thought that Seth's personality suggested he would have difficulty abiding by court orders that were contrary to him.

According to Dr. Simoneaux, Maggye believed that Seth had become a better father since they moved away because he was responsible for their sons on weekends and had to make them a priority over work.

Dr. Simoneaux noted that Maggye was seeing Cindy Nardini, a local counselor, and was being prescribed medication by Dr. Jim Quillin, a local psychologist. He knew both providers and thought she was getting very good care.

Asked by Dr. Simoneaux what would be the perfect solution, Maggye replied it would be for Seth to move to Alexandria because the boys were much happier there and are around so many cousins close to their age.

Maggye told Dr. Simoneaux that she had been charged with careless and reckless operation in 2005 and had a DWI in 2006. She smoked marijuana periodically in high school. She drank every day for six weeks in 2017. She had regularly used painkillers for two to five months, and had taken prescribed stimulants. Maggye thought Seth had a problem with alcohol.

In his summary, Dr. Simoneaux noted that Seth was very critical of Maggye. Maggye seemed to acknowledge much quicker than Seth that the other parent is a good parent. Dr. Simoneaux feared that as long as the parents have continued anger toward each other, they will inevitably communicate those animosities to their children. He recommended therapy for Seth, whose anger toward Maggye was regarded by Dr. Simoneaux as palpable and difficult to resolve.

Dr. Simoneaux presented several reasons for relocation. The children are close to their extended family in Alexandria, and Maggye has a job as a case manager for a wraparound social services agency there. She works

only 40 hours per week and seems more available than Seth, who works up to 60 hours. Dr. Simoneaux was confused by Seth's assertion that it would be impossible for him to start over in Alexandria. He thought that moving Maggye away from her mental health care providers would be detrimental to Maggye and therefore detrimental to the wellbeing of the children. Dr. Simoneaux characterized Seth's reasons against relocation as being generally spurious. Dr. Simoneaux believed that because Seth has complete flexibility with his job, he should be able to find a way to be involved in his children's activities in Alexandria.

It was very significant to Dr. Simoneaux that Seth wanted an equitable physical custody split if Maggye returned to Shreveport. Dr. Simoneaux believed that assertion obviated nearly every criticism that Seth had against Maggye as a parent because he was clearly not worried about her potential substance abuse, excessive spending, or mental health concerns. Thus, his complaints about her inadequacies as a mother were not credible.

Dr. Simoneaux considered that Maggye moved away primarily for her convenience and wellbeing. He concluded that Maggye needed to stay in Alexandria to ensure her stability because that was where she had the support of her family, church, and treatment providers. That support would help Maggye be the best mother that she could. Dr. Simoneaux noted that test results indicated that Maggye was likely to be quite compliant with her treatment and he had good reason to believe her progress would continue. He noted that Seth acknowledged that Maggye was a good mother, and he hoped that Seth would agree that the maintenance of her mental health would play an important role in ensuring that she continued to be a good mother.

7

Dr. Simoneaux acknowledged that since neither parent wanted to move, the question of who would be the primary custodial parent was a close call. He concluded that it may be best for the children to be primarily located in Alexandria with Maggye as the domiciliary parent. He recommended that Maggye and Seth meet with a parenting coordinator, preferably Shelley Booker in Shreveport.

***Further filings***

On December 19, 2018, Seth filed a motion to set the final periodic spousal support issue for trial. Trial was set for February 5, 2019. On January 24, 2019, Maggye filed a motion to rescind the order setting the trial. The matter was reset for trial on April 24, 2019.

On May 1, 2019, the trial court granted Seth's motion for his attorney of record to withdraw and for new counsel to enroll.

On May 23, 2019, Seth filed a motion to compel discovery related to Maggye's diagnosis and treatment for substance abuse. On June 10, 2019, Maggye's attorney withdrew as counsel of record and a new attorney enrolled for her.

On September 16, 2020, Seth's current attorney enrolled as counsel of record. All pending matters were set for trial on January 13 and 14, 2021.

On September 29, 2020, Seth filed a motion to order drug testing of Maggye. Maggye tested positive for cannabinoids and butalbital on a drug test performed on October 26, 2020. She was negative on a drug test performed in January of 2021.

The trial scheduled for January of 2021 was reset to April because of an illness in the trial court's family. On March 26, 2021, Maggye filed a petition to relocate the children to Alexandria.

8

***Trial on the merits***

The trial was held on April 12 and 13, 2021. Dr. Simoneaux testified as an expert in the field of clinical psychology specific to child custody evaluations. He had no new information about the parties since his report was dictated two years earlier.

Dr. Simoneaux testified that Maggye told him that prior to treatment she would ask Seth for help, but he was dismissive of her needs and told her that she should be able to handle it all since she stayed home during the day while he worked. Dr. Simoneaux thought Maggye's substance abuse was relatively brief but significant.

Dr. Simoneaux recalled that when Maggye brought H.W. to Seth's interview, she was very cordial to Seth, while Seth was more distant. Dr. Simoneaux was immediately impressed that Maggye told H.W. that it was exciting that he would get to see his father. During the interview, he thought Seth found it difficult to say anything positive about Maggye, while in contrast, she said he was a good father.

Test results indicated to Dr. Simoneaux that Seth did not perceive Maggye as getting in the way of his relationship with his sons. Dr. Simoneaux, who wants the children to see their parents cooperating, thought at the time of the interview that Maggye was in a better position to promote a positive image of Seth in front of the kids.

Dr. Simoneaux found Seth to be consistently arrogant. He also thought Seth did not take much personal responsibility for the failings in his life.

Dr. Simoneaux was puzzled that Seth agreed to Maggye's family taking care of the kids during the week while she was in treatment since he

9

had a lot of freedom with his time as owner of Digital Logic. In addition, Seth complained about some of the people Maggye was associating with after discharge from Edgefield, yet he took no actions to remove the kids from her care. Dr. Simoneaux thought Seth's priorities in life were suspect.

Dr. Simoneaux had no doubt that Maggye could find work in Caddo Parish as a case manager for a wraparound social services agency. He acknowledged that it would be difficult for Seth to uproot his business and move it to Alexandria. However, he also testified that jobs were not the only consideration. He thought Seth should accept making less money if it meant spending more time with his sons. He pointed out that Seth had complete control over his schedule. Dr. Simoneaux considered that it had been possibly to Seth's advantage to have Maggye watch the kids in Alexandria while he devoted time to his business. That was a values statement to Dr. Simoneaux.

Dr. Simoneaux was asked about Seth's resistance to bringing H.W. to Alexandria on Saturdays for soccer games. He replied that while Seth might not be happy the games are played in Alexandria, soccer was something that H.W. enjoyed. He believed that if it was important enough to Seth then he would be there. He added, "I bet you if he had $100,000 waiting for him to go to that soccer game and be on time he would have been there."

Dr. Simoneaux was surprised that Seth believed Maggye was a good mother in light of all his complaints about her. He was also troubled by Seth's perfect solution that Maggye would return to Shreveport and they would share custody, after criticizing her as being mentally ill, a substance abuser, a thief, and a bad decision maker. Dr. Simoneaux thought that Seth's position was illogical and it was a critical point in the interview

10

because it meant Seth's criticisms of Maggye were possibly an exaggeration or a lie.

Dr. Simoneaux was concerned that Seth would have a difficult time containing his attitude about Maggye around the children. He felt that Seth's palpable anger in March of 2019, whether justified or not, was going to be communicated to the boys unless Seth underwent therapy.

Dr. Simoneaux noted that Maggye needed to maintain her therapeutic relationships, especially with her counselor Nardini. Severing that relationship would be detrimental to her and possibly to the children as well.

Dr. Simoneaux testified that it might affect his evaluation if it can be shown that Maggye planned to deceive Seth into thinking that she would return to Shreveport when from the beginning her intent was not to return. When asked about the difference between what she conveyed at Edgefield about remaining in Alexandria and what she later told Seth in text messages, he agreed that it was possible that she was deceiving Seth. However, he added that it was also possible she had changed her mind. He thought it would have been evident on her personality test if Maggye was capable of such a long-range plan of deception.

Dr. Simoneaux acknowledged that he normally does not recommend a relocation and is critical of people who relocate. However, he considered this case to be unusual in some respects. He explained that he was basing his recommendation on the importance of Maggye continuing in treatment. The significance of Maggye continuing her relationship with Nardini was weighed heavily because it would be difficult for her to develop one with a new counselor. Dr. Simoneaux also thought a convincing case was made for the importance of her extended family in Alexandria. Maggye had

11

significant mental health and physical problems, and the need for family support was important. Not only were the children familiar with their relatives in Alexandria, but they had developed routines there. H.W. had started school and both children had been established in the community through extracurricular activities. Dr. Simoneaux thought many of Seth's answers as to why relocation was extraordinarily onerous were not terribly convincing. He could not understand Seth's argument that he could not move because of work when he admitted having great flexibility at work. Seth could make arrangements to be involved in his sons' lives and possibly move. Moreover, Seth's suggestion of equal custody was a critical element in Dr. Simoneaux's recommendation. Although Seth was critical of Maggye, he implied through his actions that he was not really worried about her as a primary parent. Finally, Dr. Simoneaux considered Maggye to be in a better position to encourage and foster the children's relationship with Seth.

Seth testified concerning the spending and substance abuse problems which plagued the marriage. He explained that he felt especially betrayed when he learned that Maggye had removed the money from the Conversion Twelve account. He claims that he argued with Maggye at times concerning her nursing of W.W. after she had been drinking.

Seth recounted an incident which occurred on July 4, 2017, when Maggye had slurred speech and attempted to leave a family party with the boys in her vehicle. After the kids were removed, Maggye hit Seth's truck as she drove away.

Seth asserted that he did not know the severity of Maggye's substance abuse until he obtained her treatment records from Edgefield. While he

observed her intoxicated on occasion, it was not to the extent that he thought required rehabilitation. Maggye would deny to him that she been drinking despite having an odor of alcohol on her breath.

Seth explained that the original arrangement in July of 2017 was that Maggye's mother would watch their sons in Alexandria during the week while she was in rehabilitation. That way he could work during the week and then get the boys on weekends. He thought that would last for several weeks.

He eventually agreed to allow the children to stay in Alexandria for longer but with the understanding they would return in time to start school in August of 2018. This was reflected in text messages in 2018. Seth stated that he would not have allowed his sons to go to Alexandria had he known they would remain there.

Seth testified that Maggye blocked his communications with their sons over FaceTime a significant number of times. Introduced into evidence was an email from him on Christmas Eve, 2019, in which he complained to her that he had tried calling the boys five times on the prior night but the phone was not answered, and that he had tried calling them three times that day but had been blocked. He also testified that he requested that they attend sessions with the parenting coordinator recommended by Dr. Simoneaux. He agreed to pay for the cost and Maggye's gas expenses. He communicated this in an email to her on September 4, 2019, and her response was she would speak with her lawyer.

When Seth was asked for his thoughts on how Dr. Simoneaux was troubled by his wish for equal custody after being so critical of Maggye, he explained that he thought his sons needed both parents and he wanted to

avoid future animosity from his sons if he separated them from their mother. Despite all the bad things that she did, he still felt that their sons needed her. Seth did not want to do anything that would make his kids hate him when they were older. He knew how much she loved them and did not want to do anything to take the boys from her.

Seth admitted that his work allows him to have flexible hours. He would have no problem having a smaller workload during a week and then catching up the following week. Their sons would attend private school in Shreveport, with Seth paying the tuition.

Seth lives in a large home located on Cross Lake in Shreveport. The home has a dock, and Seth owns a boat. His sons have a few friends that live in the neighborhood. Seth complained that his sons probably spent more time at their maternal grandmother's home than they do at their own home in Alexandria. They often go to their grandmother's home after school.

Seth was asked by the court regarding possible anger issues and his actions in court, which included audible grunts and gasps and reactions of frustration. The trial court noted that Seth had involuntarily showed his frustration before it, which was interpreted as a self-control issue.

Maggye, who has a degree in sociology, works as a case manager for a wraparound social services agency. She began working there in January of 2019. She testified that she derives a lot of joy from her job. She made less than $30,000 in 2020.

Maggye testified that her older sons attend a neighborhood school less than half a mile away from their home. H.W. has a 3.67 GPA. W.W. goes

14

to preschool at Calvary Baptist Church in the morning three days a week, and is cared for by her mother in the afternoons.

Maggye commented that the boys have many opportunities for outdoor activities in Alexandria. She also testified that the boys have friends within walking distance of home. H.W. wants to take karate, but the classes are on Tuesday and Friday. H.W. is on a soccer team, but he could only practice because his games were on Saturday and Seth would not bring him to Alexandria for the games. Seth explained that he did not bring H.W. back to Alexandria for his soccer games because he felt it was more important for them to spend time together in Shreveport than in the car. He pledged to make the drive if it came up again.

Maggye also testified that the boys are involved in activities at their church. She considered the boys to be thriving in Alexandria and established there. She felt that it would break H.W.'s heart to move before he enters fifth grade.

Seth disputed that Maggye has extended family only in Alexandria. He testified that her father, stepmother, sister, brother-in-law, and niece live in Shreveport. Maggye testified that although her father and stepmother live in Shreveport, they were planning to move to Alabama. Her family in Alexandria includes her mother and stepfather; a sister, brother-in-law, and their two young sons; an aunt and an uncle; and a cousin, her husband, and their young son. She said they enjoyed family gatherings nearly every weekend. Maggye thought having family to help with the kids so she could get back on her feet was a good faith reason to relocate.

Seth has never been to a parent-teacher conference. H.W. began speech therapy in 2021, but Seth has not attended one of his therapy sessions

or spoken to the therapist. He did not know the names of his sons' pediatrician or dentist. He was not present when H.W. had his adenoids removed and tubes placed in his ears; Seth did not recall why he missed that procedure. Maggye remembered that Seth missed the procedure because he had a meeting that morning. Seth was not positive about the nature of H.W.'s allergies and thought he had a file with the information somewhere.

Maggye agreed that Seth was unaware of the extent of her substance abuse problems because he was seldom home during that period. She testified that she had been drinking for a month before checking herself into rehab. She also testified that she had taken pain pills obtained from a neighbor from March until May in 2017.

Maggye testified that her agreement with Seth was that her mother would watch the boys during the week while she was in treatment so Seth could work. She stated that this arrangement was a convenience to both of them. She testified that they discussed the arrangement before she selected Edgefield.

Maggye testified that it was with Seth's permission she remained in Alexandria with the children after she was discharged from Edgefield. She testified that he told her to stay there until after Christmas. She explained that she had every intention of returning to Shreveport, but she could not once she saw how much her children were thriving in Alexandria.

When Maggye was questioned about what was written on the evaluation form at Edgefield about her future plans, she explained that Seth had told her that she could live in Alexandria with the boys because he needed to focus on getting his business started. Her mother would help her with the boys.

Maggye testified that in July of 2018, she decided to permanently remain in Alexandria after discussing the benefits of staying near her family. She acknowledged that up until May of 2018, she was telling Seth that she was returning to Shreveport, but admitted that she took no steps to do so until July 2018, because she and Seth agreed that the boys needed to finish school. In addition, her mother was there to watch the kids during the summer while they both worked.

Maggye considered herself to be a better mother than she was before she left for Alexandria. She believes that she is a different person now because of the support of her family and that her improvement has contributed to the wellbeing of her children.

When questioned about the money that she removed from the Conversion Twelve account, Maggye testified that she spent the money on groceries, in-game purchases for apps, clothing for the boys, and gifts. She offered to give her engagement ring and $30,000 worth of stock in a local bank to Seth. She testified that the only time that Seth truly got mad at her was about the money.

Maggye denied deliberately preventing Seth from communicating with his sons. She testified that the boys try to call Seth before school in the morning. He will call them in the evening but sometimes she does not hear the phone. The boys have an iPad and a phone that Seth can contact them on at any time. She tries to make sure that H.W. answers the phone when she is near him.

Maggye testified that she failed the drug test because she took two THC gummies offered by a friend when she was sick with COVID. Her mother cared for the children while she was sick. She admitted that she

17

delayed taking the drug test because she had taken the gummies. She claimed no other relapses. A drug test in January of 2021 was negative. Maggye claimed that she saw Seth use marijuana while they were together. She also testified that Seth drank alcohol a lot.

Maggye pled guilty to reckless operation in 2007 after being arrested for DWI. She pled guilty to DWI in 2009.

***Reasons for judgment***

The trial court first concluded that Maggye's failure to file her petition for relocation for more than three years did not result in a waiver of her right to seek relocation. Likewise, the court found that Seth's acquiescence to the children remaining in Alexandria during that period and his failure to assert his rights was not a waiver of his procedural defenses to relocation. The court did not believe that any strict application of the procedural requirements could be used to prevent the merits of the case from being considered.

The court concluded that Maggye was in good faith when she gave notice to relocate on August 30, 2017. Namely, she relocated to be close to significant family support networks and for significant health reasons. The court did not believe that Maggye's subsequent actions vitiated this good faith. The court accepted the contention that Seth showed restraint early in the ligation partly out of hopes of salvaging the marriage. However, the court noted that Seth had acquiesced to the physical relocation, consented to two interim orders, and only provoked a hearing when his current counsel enrolled. Thus, the court doubted that Seth had been deceived by Maggye from November of 2018, when the divorce was granted, to August of 2020 regarding her plans. Furthermore, the court did not consider her text

18

messages to be part of a litigation tactic or a cold calculation to dupe Seth. Rather, she appeared to be distressed about the dissolution of the marriage and was indecisive. The court concluded that her reasons for staying relocated were legitimate.

Before it considered the application of the relocation factors found in La. R.S. 9:355.14, the court made some overall observations. It noted Dr. Simoneaux's recommendation. The court also addressed some problematic behaviors by Maggye, including the positive drug test. The court noted that it had reservations about her commitment to her medication regimen for her bipolar disorder, but this was mitigated by Dr. Simoneaux's faith in her treatment team and her own commitment to continuing her recovery.

The court noted that Seth was content to leave the supervision of his children to Maggye's family. Although the court accepted that this was done partly to accommodate Maggye and to protect the children from any trauma, having his children cared for by others benefited his ability to develop his business.

The court was troubled by Seth's ignorance of the depths of Maggye's addictions. The court considered the ultimate problem to be some of the gaps in Seth's parenting knowledge and the choices he made about being involved in his sons' lives. The court was particularly disturbed by Seth's absence from H.W.'s surgical procedure.

After considering the La. R.S. 9:355.14 factors, the court concluded that Maggye had met her burden of proof. Her petition to relocate the children was granted. The parties were directed to continue under the previous interim judgment and to submit a proposed custody plan within 30 days.

**DISCUSSION**

Seth contends that: (1) the trial court erred by applying the incorrect law to the procedural defect created when Maggye failed to institute relocation proceedings pursuant to La. R.S. 9:355.9; (2) the trial court erred when it applied the incorrect law and reasoned that Seth acquiesced to Maggye remaining in Alexandria with the children during the course of the litigation; (3) the trial court erred when it misinterpreted La. R.S. 9:355.10 and concluded that Maggye was in good faith when she relocated the children to Alexandria; and (4) the trial court abused its discretion when it determined that relocation to Alexandria was in the children's best interest.

A trial court's determination in a relocation matter is entitled to great weight and will not be overturned on appeal absent a clear showing of abuse of discretion. *Gathen v. Gathen*, 10-2312 (La. 5/10/11), 66 So. 3d 1; *Curole v. Curole*, 02-1891 (La. 10/15/02), 828 So. 2d 1094.

***Motion to dismiss appeal***

In the conclusion and decree section of the judgment, the trial court ordered the parties to submit a proposed permanent custody plan within 30 days. Maggye argues that the judgment which Seth is appealing is a partial judgment because the trial court did not rule on the custody issues before it despite the trial being set for "all pending matters." Thus, Maggye maintains that this appeal should be dismissed because this Court lacks subject matter jurisdiction.

A partial judgment as to one or more but less than all of the claims, demands, issues, or theories against a party shall not constitute a final judgment unless it is designated as a final judgment by the court after an express determination that there is no just reason for delay. La. C.C.P. art.

20

1915(B)(1). In the absence of such a determination and designation, any such order or decision shall not constitute a final judgment for the purpose of an immediate appeal. La. C.C.P. art. 1915(B)(2).

No appeal may be taken from a partial final judgment until the judgment has been designated a final judgment. La. C.C.P. art. 1911(B). The judgment at issue in this case was never designated as a final judgment.

Appellate courts have the authority to exercise supervisory jurisdiction if the appellant filed a motion for appeal within the 30-day time period provided for the filing of an application for supervisory writs under URCA, Rule 4-3. *Burmaster v. Plaquemines Parish Gov't,* 07-2432 (La. 5/21/08), 982 So. 2d 795; *AG Resource Mgmt., LLC. v. Bunge N. Am., Inc.*, 53,417 (La. App. 2 Cir. 3/4/20), 293 So. 3d 1179.

The judgment was signed on August 6, 2021. The petition for an appeal was filed on September 1, 2021.

In light of the nature of this proceeding and considering the interest of justice and the importance of prompt decisions in matters concerning child custody, we exercise our supervisory jurisdiction and convert this matter to a writ.

***Failure to institute relocation proceedings***

Seth maintains that the trial court erred by relying on a case applying outdated law when it considered the implications of Maggye's failure to institute summary proceedings to relocate.

La. R.S. 9:355.9 states:

> Except as otherwise provided by R.S. 9:355.4(B), the person required to give notice may relocate the principal residence of a child after providing the required notice unless a person entitled to object does so in compliance with R.S. 9:355.7.

21

> If a written objection is sent in compliance with R.S. 9:355.7, the person proposing relocation of the principal residence of the child shall initiate within thirty days after receiving the objection a summary proceeding to obtain court approval to relocate. Court approval to relocate shall be granted only after a contradictory hearing.

Seth objected to relocation on September 22, 2017. Seth argues this triggered the application of La. R.S. 9:355.9 and required Maggye to institute a summary proceeding within 30 days, which she failed to do. Seth maintains that the trial court erred in relying on *Richardson v. Richardson*, 2000-1641 (La. App. 1 Cir. 12/22/00), 774 So. 2d 1264, for the position that Maggye was not precluded from seeking relocation. Seth argues that *Richardson* was decided well before the relocation statutes were revised in 2012.

At the time that *Richardson* was decided, La. R.S. 9:355.8 provided that the parent objecting to relocation must initiate a summary proceeding within 20 days after receiving notice and seek a temporary or permanent order preventing the relocation.

The parent in *Richardson* who opposed the relocation filed his objection outside the 20-day window. Nevertheless, the *Richardson* court concluded that this failure did not forever preclude him from opposing the relocation. Instead, he merely forfeited the opportunity to prevent an immediate relocation through a summary proceeding.

Although La. R.S. 9:355.9 now states that the parent proposing relocation shall initiate a summary proceeding for court approval of the relocation within 30 days after receiving the objection, the rationale behind *Richardson* is still helpful. Under the circumstances of this case, Maggye did not lose the opportunity to seek court approval for relocation when she

22

failed to timely initiate a summary proceeding. While the ultimate goal is a speedy resolution of the relocation issue, for various reasons the matter was not brought to trial until the children had been living in Alexandria for nearly four years. Moreover, as pointed out by Maggye, the 30-day provision in La. R.S. 9:355.9 is triggered when written objection is sent in compliance with La. R.S. 9:355.7. That statute requires that the objection shall be made in writing by registered or certified mail, return receipt requested, or delivered by commercial courier as defined in La. R.S. 13:3204(D), to the mailing address of the person proposing relocation. None of that was done by Seth in this matter as he filed his objection in the record of this pending matter and it was sent to Maggye's attorney of record. This argument is without merit.

***Acquiescence to relocation***

Seth next argues that the trial court erred when it relied on *Richardson* to determine that Seth acquiesced to the children remaining in Alexandria during the course of the litigation because he failed to assert his rights.

Seth argues that he was led to believe that Maggye was going to return to Shreveport and that he was placed in a position of handling the matter delicately considering the circumstances. He contends that he was trying to keep his family intact while starting his internet marketing business. Seth argues that he agreed to the interim orders because he reasonably believed that Maggye and the children were going to return to Shreveport.

Seth insists that he never acquiesced to the children relocating to Alexandria, but instead initiated legal proceedings and requested that the matter be set for trial to have the children returned. Seth notes that Maggye

23

did not seek permission to relocate in her 2017 petition for divorce, while he filed his objection in the record on September 22, 2017.

Seth contends that when it became clear in late spring or early summer of 2018 that Maggye was not going to honor her promise of returning to Shreveport, he filed a petition for divorce in August of 2018 and prayed that the relocation and custody matters be set for trial. After Dr. Simoneaux's report came out, he engaged in further discovery to learn more about Maggye's substance abuse problems. He filed a motion to compel in May of 2019 and discovery was not satisfied until March of 2020.

The trial court first considered Seth's acquiescence to the children living in Alexandria in the context of whether it caused any claim preclusion to the detriment of Seth. The court found that it did not. The court next considered Seth's acquiescence when examining the good faith element.

We agree with Seth's position that the interim orders were not final. However, the interim orders did not serve as the sole basis for the court's finding that Seth acquiesced in the children remaining in Alexandria for more than three years.

Regardless of whether the move to Alexandria was temporary at the beginning, it is clear from the record that having the children stay with Maggye's mother in Alexandria was a matter of convenience to Seth. It freed him to build his business in Shreveport. Moreover, while Seth claims he waited on Dr. Simoneaux's 2019 report and then for Maggye to comply with discovery in March of 2020 before taking additional steps, there was a period when Seth and Maggye repeatedly replaced counsel. More specifically, Seth's counsel withdrew and new counsel enrolled in May of 2019. His current counsel did not enroll until September of 2020. It is

reasonable to conclude that Seth was content with the status quo of Maggye and/or her mother raising his kids in Alexandria while he focused on his business in Shreveport. Seth's argument is without merit.

***Good faith***

Seth argues that the trial court erred when it misinterpreted La. R.S. 9:355.10 and concluded that Maggye was in good faith when she relocated the children to Alexandria. The person proposing relocation has the burden of proving that the proposed relocation is made in good faith and is in the best interest of the child. La. R.S. 9:355.10. The "good faith" inquiry is separate from the determination of whether the relocation is in the best interest of the child. *Wylie v. Wylie*, 52,800 (La. App. 2 Cir. 5/22/19), 273 So. 3d 1256.

The meaning of "good faith" in the context of a relocation was discussed by this court in *Wylie*:

> Jurisprudence has defined the meaning of "good faith" in the context of relocation as a legitimate or valid reason for the move. Legitimate reasons for relocation include: to be close to significant family or other support networks; for significant health reasons; to protect the safety of the child or another member of the child's household from a significant risk of harm; to pursue a significant employment or educational opportunity; or to be with one's spouse (or equivalent) who is established, or is pursuing a significant employment or educational opportunity in another location.

*Id.*, 52,800 at p. 4, 273 So. 2d at 1259. (Citations omitted.)

Seth maintains that Maggye moved to Alexandria for the purpose of drug rehabilitation, which he asserts is not a good faith reason to relocate. Furthermore, although the trial court found that Maggye moved to Alexandria to be closer to her mother and other support networks, that reason did not materialize until after she relocated.

25

Under the circumstances presented in this case, Maggye's move to Alexandria to seek substance abuse treatment was a legitimate reason to relocate. The children were dependent on the mental and physical wellbeing of their mother, who was their primary caregiver. Additionally, Seth's argument does not take into account that a support network would be part of her recovery from addiction.

We also agree with the trial court that Maggye's good faith was not vitiated by subsequent actions. While the text messages quoted earlier in this opinion reveal that Maggye was discussing her return to Shreveport, there is no evidence that they were part of a calculated plot to encourage Seth to defer taking action. It was undoubtedly a confusing time for both parties as their marriage was falling apart, Maggye was grappling with her addiction problems, the kids were being raised by their maternal grandmother for part of the time, and Seth was focused on his business ventures. Certainly, Seth reasonably knew no later than the end of the summer of 2018 that Maggye was not returning with the kids to Shreveport. For the foregoing reasons, we discern no abuse of discretion in the trial court's finding that Maggye's relocation was done in good faith.

***Best interest***

Finally, Seth argues that the trial court abused its discretion when it determined that relocation was in the best interest of the children.

The factors for the court to consider when deciding whether or not to grant a relocation are set forth in La. R.S. 9:355.14:

A. In reaching its decision regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:

26

(1) The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.

(3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's views about the proposed relocation, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.

(6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.

(7) The reasons of each person for seeking or opposing the relocation.

(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.

(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.

(10) The feasibility of a relocation by the objecting person.

(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.

(12) Any other factors affecting the best interest of the child.

B. The court may not consider whether the person seeking relocation of the child may relocate without the child if relocation is denied or whether the person opposing relocation may also relocate if relocation is allowed.

Seth claims that factors 2,3,7,8,10, and 11 weigh heavily against relocation, while no specific factor weighs in favor of it.

Examining factor (1), the court noted that Maggye had been more involved in the parenting. Meanwhile, although Seth had been disadvantaged by physical distance, he had not given maximum effort to be involved in his parental obligations.

27

The court found that factor (2) was difficult in this matter as the denial of relocation would have a deleterious impact on the children as it would constitute a relocation to Shreveport. Seth disagrees, arguing that because of the young ages of the children and the fact neither child has significant roots in Alexandria, relocation would have minimal impact on their physical, educational, and emotional development.

Regarding factor (3), the court agreed with Dr. Simoneaux's concerns that the status quo of the children living in Alexandria would more likely facilitate co-parenting. The court believed the children were too young for their views to be taken into account under factor (4).

Looking at factor (5), the court concluded that while the parties exhibited poor co-parenting behavior in the past, it was mostly reciprocal and had been largely remediated. Factor (6) addresses how relocation will affect the general quality of life for the child. The court did not believe that either Alexandria or Shreveport offered any advantage in education over the other. The court did find that the extended family support network in Alexandria did offer an advantage to the children.

Factor (7) takes into account the reason for each party to seek or oppose the relocation. The court found that Maggye sought relocation in good faith. Seth disagrees and argues that having a drug problem is not a legitimate reason to relocate a child. The court also found that while Seth's opposition may be partly influenced by his anger toward Maggye, it is ultimately based on his sincere desire to spend more time with their sons.

Factor (8) deals with the current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the children. The court acknowledged that in reality

this is not a proposed relocation. Maggye had been in Alexandria for three years at the time of trial and had found employment there that appeared to benefit her recovery. The court considered the possibility that Seth could live somewhere between Alexandria and Shreveport to facilitate greater involvement in his sons' lives while still being able to run the Shreveport business.

Seth argues the trial court failed to give appropriate weight to this factor when it did not penalize Maggye for moving to Alexandria for reasons unrelated to employment. He notes that Maggye makes approximately $30,000, has a college degree in sociology, and could find the same work in Caddo Parish. Seth emphasizes that because the nature of his business demands a collaborative effort with his 12 employees in Shreveport, it would be unrealistic for him to move his company to Alexandria or to open a second office there.

The court did not consider factor (9) to be an issue. Factor (10) addresses the feasibility of a relocation by the objecting parent. The court referred to its analysis for factor (8) and added that some accommodation to minimize the distance could be achieved by Seth.

Seth considers factor (11) to be potentially the most important factor. It deals with any history of substance abuse by either parent including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation. The court noted Maggye's grave history of substance abuse, but also recognized that she was successfully managing her recovery. The court also pointed out that Seth's advantage in this factor was diminished by his alcohol consumption and his failure to fully appreciate the potential severity of Maggye's substance abuse and how it would potentially

29

impact the children. Seth argues that substance abuse is not a legitimate reason for relocation and this factor should have been weighed heavily against relocation.

Based upon our review of this unfortunate record, we cannot conclude that the trial court abused its discretion in finding that relocation was in the best interest of the children. Maggye's history of substance abuse is troubling, but she appears to have kept those problems in check for the time being, her positive drug test notwithstanding. This Court is also troubled by Seth's habit of relying on Maggye and her mother to raise their sons while he directs his focus at his business ventures. While we recognize that Seth was placed at an incredible disadvantage with the passage of time in that his kids became accustomed to living in Alexandria over several years, we cannot ignore the impact that now uprooting the children would have on their wellbeing.

## CONCLUSION

For the foregoing reasons, at Seth Winterer's costs, we convert this appeal to a writ, deny the writ, and refer this matter to the trial court for consideration of any remaining custody matters.

**WRIT DENIED**.